McGill Law Firm
4421 North 75th Street, Suite 101
Scottsdale, Arizona  85251
480-970-6720
gregmcgill@mcgillazlaw.com
Gregory G. McGill, No. 011020
Attorney for plaintiff Pacesetter

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Pacesetter Consulting, LLC, an Arizona limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> Herbert A. Kapreilian, a California citizen; Eastside Packing, Inc., a CA corporation; Craig L. Kapreilian, a California citizen; Fruit World Nursery, Inc; a CA corporation; Agricare, Inc., a CA corporation; Tom Avenelis, a California citizen; Duda & Sons, LLC a Florida company; Daniel Duda & Mark R. Bassetti, FL citizens. <br><br> Defendants. | No. 2: 19-cv- <br><br> COMPLAINT <br><br> [Breach of Contract; Conversion; Consumer Fraud; Breach of Fiduciary Duty; Constructive Fraud; Fraudulent Concealment; Negligent Misrepresentation; Tortious Interference with Contract; Federal RICO: *18 USC Sec. 1962*; Unjust Enrichment] <br><br> (Jury Trial Demanded) |

Plaintiff Pacesetter Consulting, LLC ("Pacesetter") alleges a direct action against the defendants and proceeds under diversity jurisdiction and federal question jurisdiction herein:

## NATURE OF THE CASE & SUMMARY

1.      This is a tort case arising out of securities offerings in Phoenix, AZ to finance two citrus orchards in the San Joaquin Valley, CA. In the early 2000's John R. Norton III ("JRN") (now deceased) and Roger Stevenson were in the agribusiness. At that time JRN's son John P. Norton ("JPN") started doing business with defendant Craig Kapreilian, a California citrus grower.

2.      In December, 2005 JRN, JPN, Stevenson and Craig Kapreilian launched the orchard venture by forming a management company named Citrines Operations, Inc. to develop and cultivate the orchards. Citrines was incorporated in December 2005 with JPN, Stevenson and

Craig Kapreilian as directors of the corporation. Afterward, a securities offering was made to finance the two orchards with 14 proprietary cultivars that Craig Kapreilian possessed and selected from South Africa and Israel.

3.     Craig Kapreilian was the principal in Fruit World Nursery, Inc and it represented to the citrus industry and to potential investors in advertisements that its proprietary cultivars were the product of scientific development over a 14-year period, were exclusively licensed, and were subject to patents that generated 3% royalty payments on net sales to retailers. **Exhibit 11.**

4.     On March 1, 2004 Herbert Kapreilian sold a large portion of the subject land to Norton Enterprises, L.P. a California limited partnership. **Exhibit 1.** At that time Herb Kapreilian sold the subject land for $5,600 per acre, reduced the price to $4,200 per acre, and passed the $1,400 per acre credit to Norton Enterprises, LP so long as it ensured that the proposed investment would contract with Eastside Packing, Inc. (Herb's company) to perform packing needs. In 2006 JPN and Stevenson structured the investment as Phoenix Orchard Group I, LP ("POG I") and Phoenix Orchard Group II, LP ("POG II") to grow proprietary cultivars in Fresno Valley, California. Norton Enterprises, L.P then sold the subject land to JPN at cost and JPN then sold the subject land to POG I and II at cost plus a 6% markup so the partnership could grow, cultivate, harvest, package and sell the mandarin orange fruit product to retailers. JPN and Stevenson then solicited passive investors to fund the POG I and II agri-business development and operations.

5.     POG I and II consisted of an Agreement of Limited Partnership, a private offering memorandum, an executive summary (**Exhibit 2**), and a Partner Capital mailing List. The general partner was Norton Stevenson Farming, L.P. and Cotton Norton Stevenson Consulting, Inc. (with JPN and Stevenson acting as principals). The Class A limited partners had nominal or no dollars invested and they consisted of Norton Stevenson Farming, L.P., Craig L. Kapreilian, John P. Norton trustee of the Norton Family Living Trust ("NFLT") restated 11/15/02, NFLT restated

6/14/06, and J&R Royalties, LLC and entity that JPN and Stevenson formed without disclosure to POG I and II to divert royalty income from the cultivars to JPN in exchange for the partnership's use of Eastside Packing, Inc for its packing needs. The Class B limited partners are 24 passive investors comprised of various individuals, entities and trusts with a minimum investment of $100,000 per unit.

6.      The *Executive Summary* represented "One hundred percent capital (no borrowings)" which was false when made as the capitalization reached 87% and the shortfall was addressed through loans from JPN and Bank of the West without disclosure to the investors because it had represented that "Management is considering adding leverage in the third or fourth year … which will increase the IRR." It also represented that profit would begin in year four which was false when made because its prices were substantially inflated above industry pricing and it planned to more than double tree planting density from 200 trees per acre to 452 trees per acre which would inevitably block sunlight, reduce photosynthesis, and harm the product. It also projected a 22.4% IRR over the planned 25-year period which was deceptive because neither JP Norton nor Stevenson independently verified the calculation, the cultivars that they touted were never subject to scientifically vetted testing, IRR time horizons rarely exceed a 5-year period with any accuracy, and inevitable freezes and other risk factors were never evaluated.[1] **Exhibit 2**.

7.      Through the Executive Summary and Private Offering materials JP and Stevenson solicited the Judson C. Ball Revocable Trust ("the Trust") to invest in POG I and II. By April 2008 the trust had invested $200,000 in POG 1 (becoming a 3.47% class B limited partner) and $200,000 in POG II (becoming a 2.32% class B limited partner). In 12-years POG I and II have never been profitable, and although plaintiff invested $400,000 in the aggregate over a decade ago he has only received one check of $5,812 on March 14, 2012. POG I and II have nearly identical limited

---

[1] In January 2007 a severe freeze hit the POG I orchard and resulted in severe damage to the crop.

partnership agreements, the limited partnership interests in each entity are securities under ARS 44-1801(26), and prior to suit the Trust assigned its right, title, interest, and claims to economic damages to plaintiff Pacesetter herein.

8.     Because the defendants committed the unlawful acts, omissions and concealment alleged herein (or ratified the conduct which is continuing to the present), Count 9 includes a claim for federal RICO under *18 USCS 1961 and 1962 et seq*. The culpable person under federal RICO are the named defendants who have acted and continue to act as an association in fact, and the RICO enterprise is Citrines Operations, Inc and J&R Royalties, LLC. These defendants, with intent, have committed and ratified predicate acts which is a pattern to profit at the passive investors' expense - and continuing to the present with a threat to continue into the future. The defendants have acted deceptively to defraud POG investors for ill-gotten gains,  knowing their use of the mail and wires to further the scheme to divert money and property from POG is harming the investors who have received no distributions over the past 12-years while defendants siphon royalty and product income that belongs to POG I and II. Most egregiously, these defendants continue the concerted scheme to funnel money from POG to themselves with no end in sight, constituting racketeering activity under *18 USC Sec 1961 et seq.* In summary, within months of the $5.5 million investment in POG I in 2006 the partnership sustained substantial losses due to **(i)** the use of the undisclosed untested cultivars vulnerable to freezes in Fresno Valley, CA; **(ii)** defendants' lack of expertise with the patented cultivars it touted in false advertisements; **(iii)** their collusive participation in side-deals which diverted funds from POG I and II; **(iv)** conversion of thousands of mandarin trees while concealing it; and **(v)** ratifying the fraudulent pricing and production numbers that Fruit World Nursery, Inc placed in its advertisements and orchard management agreements with POG I and II which has substantially harmed plaintiff.

**PARTIES AND JURISDICTION**

9.      Plaintiff Pacesetter invested $200,000 in POG I and $200,000 in POG II in Maricopa County, Arizona and it files a direct claim for damages due to the equity dilution caused by defendants tortious conduct herein.

10.     Defendant Herb Kapreilian is a citizen of California.

11.     Defendant East Side Packing, Inc is a California corporation.

12.     Defendant Craig Kapreilian is a citizen of California.

12.     Defendant Fruit World Nursery, Inc. is a California corporation.

13.     Defendant Agricare, Inc. is a California corporation.

14.     Defendant Tom Avenelis is a California citizen.

15.     Defendant Duda and Sons, LLC is a Florida limited liability company.

16.     Defendants Daniel Duda & Mark R. Bassetti work for Duda and are FL citizens.

17.     Diversity jurisdiction exists in this district under *28 USC 1332* as the Arizona plaintiff and named defendants are citizens of different states and the amount in controversy exceeds $75,000. Additionally, federal question jurisdiction exists on Count 9 under 28 USC 1331 and 1333 as the Arizona plaintiff is pursuing predicate acts of mail fraud, wire fraud, money laundering, and assisting the entry of illegal aliens under *18 USC Sec 1341, 1343, and 1956, as well as 8 USC Sec 1327.*

**ALTER EGO ALLEGATIONS**

18.     The legal separateness between the defendants should be disregarded and the defendant entities treated as an enterprise, culpable persons, or agents of each other to avoid a fraud, oppression and injustice to plaintiff. Further, defendants have acted as an association in fact, collusively and in concert throughout, have cooperated to split, commingled, siphon and abscond

with fees and income belonging to POG I and II of which plaintiff is a member. Further, defendants lack duly authorized resolutions and minutes for significant entity events, and lack the shield of corporate or limited liability separateness that would otherwise shield them from personal liability.

## GENERAL ALLEGATIONS

19.     Allegations 1-18 are re-alleged as if fully set forth.

20.     As described in the Offering documents Orchards I and II were planted to produce a high-quality mandarin orange (Citrine) and a lower quality mandarin (Dandy Dude).

21.     The offering documents described the organizational structure, farming techniques, and projected costs and benefits to produce the Citrine and Dandy Dude with 14 mandarin orange cultivars.

22.     These 14 cultivars were selected by Craig Kapreilian from a mix of 14 cultivars: 4 from Israel, 4 from South Africa, and 4 new U.S. cultivars that Craig Kapreilian ostensibly developed.

23.     Despite representations to the contrary in the Executive Summary and the Private Offering, all of the cultivars were new and unproven and without any history of agricultural viability in the San Joaquin Valley, CA.

24.      Although not disclosed at the time of plaintiff's investment, all of the touted cultivars were more vulnerable to freezes than typical U.S. mandarins and the subject cultivars required extraordinary cultivation techniques to ensure commercially viable yields and to protect them from inevitable freezes in the San Joaquin Valley.

25.     To generate income from the subject investment and to induce the limited partnership financing, Craig Kapreilian knowingly passed himself off as an expert in citrus farming with special expertise in harvesting the subject cultivars in California which plaintiff relied upon.

26.     Although citrus orchards are subject to freezes and the subject cultivars were peculiarly vulnerable to a catastrophic freeze during the period 2006-2009, contrary to advertisements disseminated to induce the investors (**Exhibit 3**), Craig Kapreilian had no experience or special expertise with the 14-cultivars and employed no special techniques to prevent or minimize the fallout from an inevitable freeze.[2]

27.     Although Craig Kapreilian ratified representations in the Executive Summary and Offering documents that (his and) the foreign cultivars were suitable for farming in California, and no crop insurance with coverage for freeze damage or yield loss was ever disclosed to POG I, II.

28.     Instead, Craig Kapreilian engaged in an untested increase in the number of citrus trees planted to 434 per acre from an industry norm of 200 per acre which he knew or should have known would decrease sunlight, yield and income. Additionally, the cultivars from South Africa and Israel were never scientifically tested and the defendants knew they were never tested.

29.     Craig Karpreilian provided no analysis or management techniques to address citrus factors such as local weather conditions, seasonal temperature patterns, tree size, tree density, and cultivar vulnerability to freezes – and he had never had the capacity to meet those challenges.

30.     Instead, the offering documents described the organizational structure of POG I and II and made inflated production and pricing projections which grossly deviated from industry and empirical data that only the defendants possessed. For the inflated pricing and yield representations see the On Point Analytics report which is **Exhibit 18**.

---

[2] Defendants also knew that many of the 14 cultivars applied not to POG I and II but to *other ranches* even though Craig Kapreilian's advertisements referred to the 14 cultivars collectively.

31.     Moreover, the Executive Summary that plaintiff reviewed before investing represented the following:

**(a)**     Craig Kapreilian's company Fruit World Growers, LLC ("Fruit World") conducted "14 years of world-leading research and development" that concluded the cultivars were suitable for California. This representation of fact was false when made.

**(b)**     Through exclusive licenses and advanced breeding techniques Fruit World had the capacity to cost-effectively produce the cultivars in California which were a superior mandarin fruit than those on the market. This representation of fact was false when made.

**(c)**     After 14-years of research and crossing hybrids Fruit World scientists selected the 14 proprietary cultivars that were bred to ensure a full season of product from October through March and a high-quality fruit all season long.[3] This statement was false when made.

**(d)**     Fruit World experts had information that its competitors had inferior fruit, growing techniques, and locations. This statement of fact was false when made and a sham.[4]

32.     The offering documents projected an annualized return of 22.4% over the 25-year life of the orchards and the investors would receive a return of principal in 6-years. However, on information and belief Stevenson caused a return of capital on June 26, 2006 in the amount of **$580,282.79** from POG II to Cotton Norton Stevenson Consulting and despite inquiry from Judson Ball's the payment has never been explained. For detail on unauthorized fees and expenditures by POG manager Citrine Operations, Inc (Craig Kapreilian, member), see **Exhibits 17A and B.**

33.     Due to the misrepresentations and omissions about product suitability and licensing exclusivity in **¶'s 23-31**, including Herb Kapreilian and Craig Kapreilian's **side deals** to divert income from POG I and II to JP Norton, Roger Stevenson, and Craig Kapreilian, the past decade has shown financial and utilization losses and virtually no return of capital to the limited partners.

34.     Craig Kapreilian's ratification of the acts and omissions in **¶'s 23-31**, which included his lack of expertise with the unproven cultivars, proximately caused plaintiff damages

---

[3] But the Executive Summary *omitted* known risk factors such as freeze, density and suitability to California.

[4] Although there were general risk disclosures in the offering about "no guaranty about weather and profitability," the specific representations about suitability, research, capacity and proprietary product were false when made and eviscerated the vague and innocuous disclaimer.

beyond his principal, interest and attorney's fees such as out of pocket costs, expert costs, opportunity costs, and additional attorney's fees.

35.     Freezes occurred in 2005-07 and 2011-12 but defendants concealed the fact that they were unprepared for them and passed it off as unexpected winters beyond their control.

### *Unauthorized & Concealed Payments* [5]

36.     Citrines Operations, Inc. paid director fees of $45,000 in 2008 and $22,500 in 2009 which Stevenson conceded were divided equally between Norton Stevenson Farming, Norton Family Living Trust and Craig Kapreilian.

37.     Citrine Operations, Inc paid wages to Craig Kapreilian which Stevenson conceded was reimbursed by POG I and II allowing Craig Kapreilian to pay bank debt.

38.     On July 26, 2006 a payment of $580,282.79 by POG II to Cotton Norton for consulting, shown as a development cost for payroll, equipment, and installation of irrigation.[6]

39.     The following unlawful acts and omissions were committed and continuing:

(a)     On January 1, 2003 JPN and Craig Kapreilian had a joint venture "to farm mandarin trees and harvest crops." On July 2, 2003 did a side-agreement to allow Fruit World to license the mandarin trees and grow the cultivars at the ranch 7 shade house. In June 2005 Craig Kapreilian planted 77,958 mandarin trees at ranch 7. On November 13,2009 Stevenson (without an enabling provision or member vote) terminated Craig Kapreilian on POG I ranch 7F (and did so again in 2010 re the ranch 7 shade house).

(b)     Due to recurring losses, in May 2012 JPN, Agricare, Inc. and Tom Avenelis removed the 77,958 fruit-producing mandarin trees from ranch 7 shade house and transplanted 43,333 trees to POG I ranch 4M, POG II ranch 8 and POG IV ranch 4, 6. On information and belief the remaining 34,625 trees were converted by Avenelis through Agricare, Inc and remain unaccounted for.

---

[5] These expenditures were unauthorized by POG I and II governing documents and went unexplained by Craig Kapreilian and Fruit World despite plaintiff's repeated good faith inquiries (**Exhibits 16, 17A, B**).
[6] Because the general partner has never corroborated the large payment it may be a concealed return of capital to general partner-investor Stevenson.

(c)     As to POG II, LP the General Ledger ("ledger") shows professional fees to CNS Consulting of $2,500 per month and Section 5.6(b) of the partnership agreement authorized the $30,000 annual expense. However, the ledger shows approximately $50,000 in accounting fees to CNS Consulting for the period 2010-2014 which was unauthorized and converted.

(d)     The ledger shows nearly $20,000 in professional fees paid to J&R Royalties, LLC (an undisclosed entity) which was unauthorized and converted.

(e)     The ledger shows fees to R.W. Greenwood which were unauthorized.

(f)     The ledger shows professional fees payable to J.R. Norton Company on December 31, 2006 of $15,000 and December 31, 20016 of $92,300 which were concealed and unauthorized.

(g)     On December 31, 2013 the capital account of Craig Kaprelian was adjusted by $10,000 without any disclosure to POG I or II.

(h)     The ledger shows the partnership paying the legal fees of Wild, Carter & Tipton which were unauthorized by the partnership; and legal fees to Layne Morrill which was unauthorized by the partnership and he had a conflict of interest because he represented one or more of the defendants without obtaining informed consent from POG I or II.

(i)     Payment for business plan consulting by Key & Co.

(j)     Craig Kapreilian's concealed termination and undisclosed litigation with the POG's general partners which damaged POG.  **Exhibit 14,** Fruit World Nursery, Inc draft master settlement agreement with J&R Royalties, LLC in 2016.

(k)     The hiring of Agricare, Inc as a POG farm manager was not vetted or authorized by POG I or II.

(l)     Herb Kapreilian's reduction in the land price and transfer of the benefit to JP Norton, knowing that the windfall belonged to the partnership.

(m)     The Kapreilian side agreements to divert royalties to J&R Royalties, LLC.

(n)     An undisclosed $400/acre fee to Stevenson from POG general partner Citrine Operations, Inc of which Craig Kaprelian is a member.

***Deceptive Advertising by***
***Craig Kapreilian & Fruit World***

40.     Craig Kapreillian and Fruit World Nursery, Inc. ("FWN") disseminated the following advertisements containing *statements of fact that were false when made* as an inducement in connection with the sale or advertisement of merchandise which under ARS 44-1521 et seq is defined as real estate and services:

      (a)     "FWN is a leading developer of premium mandarins …"

      (b)      "Only company with a full season (Oct - March) of seedless product"

      (c)     "FWN is a leading R & D organization"

      (d)     "FWN has "14 proprietary cultivars"

      (e)     "452 trees per acre versus 202 but more and higher quality fruit" [7]

      (f)     "2-year growth cycle" versus 5 to 7 years"

      (g)     "Locations selected based on detailed historical temperature maps"

      (h)     "Climate control" to increase plant growth and production"

      (i)     "Protection of … freeze reduces loss and blemishes"

      (j)     "Sales and marketing relationship with Duda … [premier] marketer"

      (k)     "Craig Kapreilian invested $6 million in the Citrines project." **Exhibit 3.**

41.     None of the advertised statements of fact were verified, vetted or tested by Fruit World, Andrew Lee or Craig Kapreillian before they were circulated to the investors.

42.     Immediately after the investment in 2006 a freeze hit the POG I orchard which was utterly unable to cope with it, resulting in substantial losses. **Exhibit 4** correspondence acknowledging the adverse impact from the January 2007 freeze.

---

[7] More than double the density of competitors was a complete disaster and was never tested.

43.     The propriety and capacity of the licensed and patented cultivars were misrepresented by Craig Kapreilian. On July 19, 2013 Mark Bassetti of Duda & Sons stated to Herb Kapreilian:  "Our discussions over the past few years have pointed out that our challenge to overcome the inconsistencies of several of the cultivars and uniqueness of several has created a challenge …" **Exhibit 4.**

44.     Several patents on the cultivars purportedly held (and sold) FW Enviro, LLC to POG were defective because Craig Kapreilian had previously assigned the patent rights to Fruit World Nursery and he therefore had nothing to convey to FW Enviro, LLC. **Exhibit 5.**

45.     As of October 29, 2013, Craig Kapreilian and Fruit World had failed to provide J&R Royalties, LLC and Citrines Operations, Inc. with new license agreements and "serious concerns regarding the accuracy of the [license and patent] representations" was raised by J&R and Citrines counsel. **Exhibit 5.**

### *Side Agreements by*
### *Herbert and Craig Kapreilian*

46.     On March 1, 2004 Norton Enterprises, LP , Herb Kapreilian and Craig Kapreilian entered into side-agreements which reduced the purchase price of the subject land from Herb Kapreilian from $5,600 per acre to $4,200 per acre which included a $170,000 credit plus a 6% growth factor to Norton for packing charges which Norton received as opposed to transferring the benefit to POG in 2006 when it invested. **Exhibit 6.**

47.     The side-deal in ¶46 was concealed from plaintiff during the period 2006 – 2018 which tolled any limitations period.

48.     As late as October 1, 2009 (and beyond) Citrine Operations, Inc. and Eastside Packing, Inc. were signing contracts without disclosure of the side-deals in ¶46.  **Exhibit 7.**

49.     Pursuant to the side-deal Herb Kapreilian made credit-payments to Norton Enterprises despite knowing that POG invested in the orchards in 2006. **Exhibit 8.**

50.     It was not until plaintiff applied pressure through inquiry in 2015 that Stevenson endorsed the side-payments to POG; and it was not until 2016 that Herb Kapreilian made the checks payable to POG I instead of Norton.  Exhibit 8.

51.     Based upon Norton's conversion of 77,958 mandarin orange trees in 2012, Eastside Packing reduced the amount of box credit to Craig Kapreilian by $6,625 annually so Kapreilian stopped paying the interest in 2013. The balance due on the loan as of April 9, 2015 was $66,817 and on June 4, 2015 JP Norton and Herb Kapreilian signed an agreement that the principal amount owed ($66,817) would be paid by Eastside Packing, Inc. directly to POG I, LP. **Exhibit 9.**

52.     From March 3, 2010 – April 8, 2016 approximately $180,000 had been paid to Norton Enterprises and $51,000 to POG I.  Exhibit 9.

### *Immmediate Unauthorized Debt*

53.     Although the Executive Summary assured the investors that 100% of the capital would be equity and there would be no debt until year 3 or 4, partnership through Citrines immediately incurred debt to cover the capital shortfall of 13% ($1.5 million) and to cover losses from the January 2007 freeze. See **Exhibits 10, 12.**

54.     The debt obligations were unauthorized by POG investors and fraudulent.

55.     The debt obligations damaged the partnership to the extent of interest paid and distraction it caused the general partners during the period of the loans.

### *Diversion of Royalties*

56.     As alleged above, defendants acquiesced-in and ratified Stevenson's undisclosed formation of J&R Royalties, LLC to receive payments of **3%** of net sales of mandarin product. **Exhibits 11, 14.**

57.     As late as March 24, 2016 J&R Royalties, LLC invoiced Herb Kapreilian's company (CRJ Farming Co, LP) c/o Eastside Packing, Inc. for $8,560.94 and neither the existence of J&R Royalties nor the diversion of funds was disclosed to the POG partnership. Exhibit 11.

### *Unlawful Labor Contractor*

58.     As late as 2010 defendant Herb Kapreilian was conspiring with the co-defendants to circumvent the law prohibiting the employment of undocumented immigrants. **Exhibit 13.**

59.     Herb Kapreilian was well aware of the duties, costs and liabilities associated with being a labor contractor and his December 7, 2010 communication to POG's general partner Stevenson shows that Herb Kapreilian had discussions with Tom Avenelis of Agricare, Inc. about the labor contractor obligations. Exhibit 13, p. 2.

### *The Concealed Insurance Proceeds*

60.     On January 22, 2019 plaintiff discovered that in mid-2012 POG I was to receive $102,486 in crop insurance proceeds and POG IV, LP was to receive $628,517 in crop insurance proceeds – but on information and belief POG I never received the $102,486.

61.     The receipt of said insurance proceeds was concealed from plaintiff by Citrine Operations, Inc (Craig Kapreilian, member) despite inquiry.

### *Herbert Kapreilian*

62.     In 2004 Herb Kapreilian sold the 150-acre Home Ranch to JP Norton for a price of $5,600 per acre.  JP dep. p. 62, 10/31/17.

63.     In 2005 JP Norton sold 100 of the acres to JR Norton for his cost ($5,600 per acre) plus a 6% markup and a 3-acre shop was carved out for Craig Kapreilian. JP dep. p. 62. This was not disclosed to POG I and II.

64.     In 2004 Eastside Packing was owned by Herbert Kapreilian.

65.     As alleged, on March 1, 2004 **side agreements** were entered into between Norton Enterprises, Herb Kapreilian and Craig Kapreilian. Pursuant to the side agreements the price for the 150 acres of land was marked up to $5,600 per acre then reduced to $4,200 per acre with the $1,400 paid as a credit to Norton Enterprises and Craig Kapreilian to be split evenly if they used Hern Kapreilian's company Eastside Packing. However, JP Norton absconded with all the side-payments and it resulted in a dilution of plaintiff's equity in POG I and II because the diversion decreased the income to the investment. **Exhibits 6-9.**

66.     In 2009 Eastside Packing entered into a contract with Citrines or POG I and II.

67.     When Craid Kapreilian did not receive the side-payments from JP Norton he sued JP Norton and his partner Roger Stevenson and that action settled in 2016. **Exhibit 14.**

*Craig Kapreilian & Fruit World Nursery, Inc.*

68.     Craig Kapreilian misrepresented his management expertise and entered into undisclosed side-agreements to receive payments that belonged to POG I and II.

69.     Craig Kapreilian grossly mismanaged the orchards and it lost money every year.

70.     In 2015 Stevenson fired Craig Kapreilian for malfeasance and incompetence.

71.     Prior to this action Craig Kapreilian sued JR Norton, JP Norton and Stevenson for the $98,000 in fees on the side agreement with Herb Kapreilian and Eastside Packing, Inc.

72.     That action settled in 2016 and the parties refuse to disclose the agreement. **Ex 14.**

73.     Craig Kapreilian through Fruit World Nursey, Inc advertised the following statements of fact to induce plaintiff's investment:

    a.    that it is a leading developer of premium mandarins
    b.    the only company with a full season of seedless product (Oct-March)
    c.    FWN is a leading research and development organization with advanced citrus breeding techniques and 14 years of extensive agricultural experience
    d.    454 trees per acre will result in larger higher quality fruit

e.   FWN's trellis system allows for earlier production with product for sale 2-3 years earlier than traditional planting

f.   Revolutionary Cyponic (shadehouse) citrus farming

g.   42-acre commercial development in production (planted in 2005) with 1,980 trees per acre with climate and temperature control and protection of freeze reduces loss and blemishes

### *Agricare, Inc & Tom Avenelis*

74.   In 2009/10 POG general partner Stevenson fired Craig Kapreilian without partnership authorization or a vote.

75.   The general partner then hired Agricare, Inc to manage the farming of the orchards in California.

76.   Agricare, Inc has failed to improve operations or generate a profit.

77.   Agricare, Inc. and Tom Avenelis participated in Norton's conversion of 77,958 mandarin trees in 2010 which was concealed from plaintiff despite inquiry.

### *J&R Royalties, LLC*

78.   To induce plaintiff's initial investment the defendants touted the exclusive licensing and patent rights that Craig Kapreilian had on the 14 cultivars.

79.   Unknown to plaintiff, at the time of the investment in 2006 JR Norton, JP Norton and Stevenson surreptitiously created J&R Royalties, LLC and used that entity to convert royalty payments of **3% of net sales** of mandarin product causing plaintiff damages in excess of $50,000.

### *Duda & Sons, LLC*

80.   In 2007 Citrines entered into a contract with Duda & Sons, LLC for a marketing and sales fee to Duda of **7% of the gross sales price** of the mandarins which was listed at $.90 per pound.

81.     Duda was not properly vetted by the POG general partner and Duda furnished the general partner with industry pricing, costs and projections which were inflated and grossly out of line with industry data which Duda possessed.

82.     Although Duda manager-directors Daniel Duda and Mark Bassetti accepted less than the expected 7% of the projected sale price of the mandarins (due to low product utilization), the Duda directors ratified and acquiesced-in the lower payments without disclosing the lower numbers to the POG I and II investors so they could act on the defendants' misconduct years ago.

**COUNT 1**
**(Breach of Contract)**
**[Craig Kapreilian & Fruit World]**

83.     Allegations 1-82 are re-alleged as if fully set forth herein.

83.     The Limited Partnership Agreements ("LPA") governing POG I and II are a **contract** between plaintiff and the general partner Citrine Operations, Inc which included Craig Kapreilian as a member. Exhibit 2. POG I and II, of which plaintiff is a member, also had an orchard development **agreement** with Fruit World Nursery, Inc wherein Fruit World promised to develop the orchards in good faith and special expertise that it advertised in writing. Exhibit 3.

84.     Defendants are a party to the LPA. Section 5.6(a) of the LPA prohibits any partner affiliate of any partner from receiving a fee for services rendered to the partnership and prohibits the reimbursement of expenses incurred. Section 5.6(b) states that any such payments must be reimbursed to the partnership's general partner and that the general partner shall be paid $30,000 annually for accounting compensation and trip expenses for monthly management meetings in Fresno, CA. Section 5.6(c) of the LPA provides "that the general partner shall receive no compensation for services in addition to the distributions of cash and other partnership property and allocation of profits and losses." The offering documents also constitute a contract between

-17-

plaintiff and defendants and they contain the same contract provisions as the LPA. **Ex's 17A, B.**

85.     By paying the payments alleged above general partner Citrine (with Craig Kapreilian ratifying it) breached the express terms of the LPA and caused plaintiff consequential damages in an amount to be proven at trial. Further, by engaging in the false advertising in ¶40 and mismanaging the development of the orchards Fruit world was fired and it breached its development agreement with POG of which plaintiff was a member.

86.     Every contract has an implied in law duty of good faith and fair dealing which requires each party not to engage in conduct that deprives the other party of the benefits of the contract and which would operate to defeat the other party's reasonable expectations under the contract.

87.     The unauthorized payments in **¶'s 36-39** constitute a breach of section 5.6 of the LPA and the implied in law duty of good faith and fair dealing between plaintiff and defendant causing plaintiff actual damages in an amount to be proven at trial.

88.     The implied in law duty of good faith and fair dealing required Craig Kaprelian to refrain from conduct that would deprive plaintiff of the reasonably expected benefits of the limited partnership agreement. *Restatement (2d) of Contracts, Sec. 205*; *Wells Fargo v. Arizona Laborers, 201 Ariz. 474, 38 P.3d 12 (2002).*

89.     On the breach of contract claim the key questions are: **(1)** were the unauthorized payments and concealment inconsistent with plaintiff's reasonable expectations under the LPA? **(2)** did the payments and concealment deprive plaintiff of a primary benefit of the agreement? **(3)** was it reasonable for plaintiff to assume the defendant would comply with Section 5.6 of the LPA and avoid diverting partnership income for his own benefit? **(4)** was it reasonable for plaintiff to assume that defendant would honor the LPA and offering documents during the period 2014-2018?

The answer to all these questions is **YES.**  See *Wells Fargo v. Arizona Laborers,* 201 Ariz. 474 (2002)**.**

90.     As alleged in ¶'s 1-89 defendant breached the LPA and the offering and the implied in law duty of good faith and fair dealing inherent in said contracts causing plaintiff consequential damages substantially exceeding the $75,000 minimum jurisdiction of this Court.

**COUNT 2**
**(Conversion)**
**[All defendants]**

91.     Plaintiffs re-allege ¶'s 1-90 as if fully set forth herein.

92.     Conversion is an intentional act of dominion or control exerted over another's property (which may include money) that so seriously interferes with the other's right to control the property that the actor may justly be required to pay the other person the full value of the property.  *Restatement (Second) of Torts* Sec. 222(A)(1).

93.     The defendants' committed conversion by *inter alia*:

**(a)**     The Kapreilians entering into side agreements to divert payments to JP Norton and Craig Kaprelian for the use of Eastside Packing Co.

**(b)**     The Kapreilians reducing the land price with a "credit" and receiving the benefit without disclosure to plaintiff.

**(c)**     Citrine (Craig as a member) accepting $400/acre compensation that was unauthorized

(d)     Defendants having knowledge of and concealing the unauthorized payments in ¶'s 36-39

(e)     Agricare, Inc and Tom Avenelis ratifying the tree conversion in ¶'s 74-77

(f)     Duda and Sons, Inc, Daniel Duda and Mark Bassetti ratifying the deceptive pricing scheme alleged in ¶'s 80-82 **("the conversion").**

94.     The acts of conversion caused plaintiff an equity dilution in POG I and II, and said acts by defendants, without legal authority, exercised such dominion and control over the partnership's activities that the diversions of income **directly harmed** plaintiff.

95.     As a direct result of the acts of conversion, plaintiff sustained consequential damages in an amount not less than **$400,000** the exact amount to be proven at trial.

96.     The defendants' acts of conversion were done with the intent to personally benefit at plaintiff's expense, were motivated by personal gain, calculated, concealed, malicious, and driven by spite and ill will.  The defendants acted to serve their own interests having reason to know and consciously disregarding the substantial risk of harm to plaintiff and the defendants pursued a course of conduct knowing that it created a substantial risk of harm to plaintiff giving rise to punitive damages in an amount to deter and punish the wrongful conduct.

**COUNT 3**
**[Consumer Fraud: ARS 44-1522 *et seq*]**
**(All Defendants)**

97     Allegations 1- 96 are re-alleged herein, in particular **¶'s 22-61.**

98.     ARS 44-1522(A) defines an unlawful practice as "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." And "merchandise" includes services. ARS 44-1521(5).

99.     First, Herb Kapreilian, Eastside Packing, Inc, Craig Kapreilian and Fruit World participated in the illicit and concealed side-deals alleged in ¶'s 46-52 which were deceptive. Second, all acts of defendants were later known by the other defendants and ratified so they could pursue their own profit at the expense of the POG partnership. Third, pursuant to ¶'s 36-39,

1  defendants made representations and omissions which were false when made and deceptive, as

2  follows:

3      (a)    "FWN is a leading developer of premium mandarins …"

4      (b)    "Only company with a full season (Oct - March) of seedless product"

5      (c)    "FWN is a leading R & D organization"

6      (d)    "FWN has "14 proprietary cultivars"

7      (e)    "452 trees per acre versus 202 but more and higher quality fruit" [8]

8      (f)    "2-year growth cycle" versus 5 to 7 years"

    (g)    "Locations selected based on detailed historical temperature maps"

9      (h)    "Climate control" to increase plant growth and production"

10      (i)    "Protection of … freeze reduces loss and blemishes"

11      (j)    "Sales and marketing relationship with Duda … [premier] marketer"

12      (k)    "Craig Kapreilian invested $6 million in the Citrines project." **Exhibit 3.**

13

14  101.    None of the advertised statements of fact were verified, vetted or tested by Fruit

15  World, Andrew Lee or Craig Kapreillian before they were circulated to the investors.

16  101.    Immediately after the investment in 2006 a freeze hit the POG I orchard which was

17  utterly unable to cope with it, resulting in substantial losses. **Exhibit 4** correspondence

18  acknowledging the adverse impact from the January 2007 freeze.

19  102.    Defendants omitted or suppressed adverse facts, as follows:

20
21  **(i)**    that research about the viability of the cultivars in CA did not occur

**(ii)**    diversion of payments from the partnership that caused an equity dilution

22  **(iii)**    the existence of J&R Royalty which was used to convert patent fees

**(iv)**    Herb Kapreilian's use of side agreements to bring business to Eastside Packing Co.

23  **(v)**    Craig Kapreilian's lack of advertised expertise regarding the subject cultivars

24  **(vi)**    Fruit World's statement of facts were false when made pursuant to ¶99

25  103.    The representations and omissions in **¶'s 99-102** were deceptive and fraudulent and

26  constituted a material omission or suppression of the truth in connection with the sale and

27

28  _____

[8] More than double the density of competitors was a complete disaster and was never tested.

advertisement of merchandise which is defined as services and plaintiff detrimentally relied upon the representations in the executive summary about the proprietary nature of the cultivars which cost the Trust consequential damages in terms of out of pocket expense, administrative costs, opportunity costs and fees in an amount greater than **$400,000.**

104.    The representations in **¶99** were false when made and deceptive.

105.    Through the false representations alleged in ¶99 defendants used a false pretense and deceptive practice in connection with the sale of merchandise which is defined under ARS 44-1521(5) as services.

106.    The allegations in ¶'s 22-61 and 99-102 constitute a false pretense and deceptive practice by defendants which is barred by the Arizona Consumer Fraud Act (**ARS 44-1522 et seq**).

107.    Defendants intended that plaintiff rely on the false pretense and deceptive practices alleged in ¶'s 22-61 and 99-102 and plaintiff relied on them to his detriment.

108.    Plaintiff was damaged as a result of his reliance upon said deceptive acts, practices and omissions in an amount not less than **$75,000** the exact amount to be proven at trial.

109.    All the representations were false when made and defendants scammed the plaintiff for profit knowing that it injured plaintiff and it implemented the deceptive practices to serve their own interests knowing or having reason to know and consciously disregarding the substantial risk of harm to plaintiff from the deceptive conduct which entitles plaintiff to **punitive damages** in an amount not less than **$400,000** to punish and deter the malicious conduct. See *Dunlap v. Jimmy GMC*, 136 Ariz. 338 (1983) (the ACFA allows punitive damages if the jury finds an intent to injure or a conscious disregard of a substantial risk of harm to a party). Also see *Schmidt v. American Leasco*, 139 Ariz. 509 (1983) (whether to award punitive damages under the ACFA is within the discretion of the jury so long as the facts show spite, ill-will, malicious conduct or a conscious disregard of a substantial risk of harm to the plaintiff from the deceptive conduct).

**COUNT 4**
**(Breach of Fiduciary Duty)**
**[Craig Kapreilian]**

110.    Allegations 1-109 are re-alleged as if fully set forth herein.

111.    While a member in general partner Citrine Operations, Inc Craig Kapreilian acted in a position of trust, loyalty, utmost good faith, competence, disclosure, accounting and reliance called a fiduciary duty.

112.    As a member in general partner Citrine Craig Kapreilian ratified and acquiesced to the following breaches of fiduciary duty:

>   **(a)**    Siphoned partnership income via unauthorized side-payments
>   **(b)**    Engaged in self-dealing by reducing land pricing and diverting it
>   **(c)**    Refusing partnership records and receipts upon partner request
>   **(d)**    Issuing an Executive Summary and Offering with false facts
>   **(j)**    Concealing the wrongful activity from plaintiff

113.    Said breaches of fiduciary duty caused plaintiff at least **$400,000** in losses.

114.    Defendant's ratification of the breaches of fiduciary duty were done with the intent to personally benefit at plaintiff's expense, were motivated by personal gain, calculated, concealed, malicious, and driven by spite and ill will.  The defendants acted to serve their own interests having reason to know and consciously disregarding the substantial risk of harm to plaintiff and defendants pursued a course of conduct knowing that it created a substantial risk of harm to plaintiff which gives rise to punitive damages against the defendants to deter and punish.

115.    The ratification of breaches of fiduciary duty by defendant caused plaintiff actual and punitive damages in an amount to be proven.

**COUNT 5**
**(Constructive Fraud)**
**[Craig Kapreilian]**

116.    Allegations 1-97 are re-alleged as if fully set forth herein.

117.    Pursuant to **¶'s 110, 111** defendant was in a fiduciary relation with plaintiff.

118.     Wrongful conduct by a fiduciary constitutes constructive fraud. The ratification of the breaches of fiduciary duty in **¶'s 110-112** constituted a constructive fraud causing plaintiff consequential damages in an amount of at least **$400,000**.

119.    Craig Kapreilian's ratification of the acts and omissions were done with the intent to injure plaintiff, were motivated by personal gain, calculated, concealed, malicious, and driven by spite and ill will.  Defendants acted to serve their own interests having reason to know and consciously disregarding the substantial risk of harm to plaintiff and defendants pursued a course of conduct knowing that it created a substantial risk of harm to plaintiff which gives rise to punitive damages in a substantial sum to deter and punish the wrongful conduct.

**COUNT 6**
**(Fraudulent Concealment)**
**[All Defendants]**

120.    Allegations 1-119 are realleged as if fully set forth herein.

121.    "One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." *Restatement (2d) of Torts, Sec. 550.*

122.    Defendants, while acting in concert and as an association in fact, **concealed** material adverse facts from plaintiff:

(i)     that research about the viability of the cultivars in CA did not occur

(ii)    diversion of payments from the partnership that caused an equity dilution

(iii)   the existence of J&R Royalty which was used to abscond with patent fees

(vii)   Herb Kapreilian's use of side agreements to bring business to Eastside Packing Co.

(viii)   Craig Kapreilian's lack of expertise regarding the subject cultivars and the false advertising in ¶40.

123.   As a result of the concealment of adverse facts plaintiff was damaged in an amount to be proven but not less than **$400,000**.

124.   The defendants' acts and omissions were done with the intent to injure plaintiff, were motivated by personal gain, calculated, concealed, malicious, and driven by spite and ill will. Defendants acted to serve their own interests having reason to know and consciously disregarding the substantial risk of harm to plaintiff and defendants pursued a course of conduct knowing that it created a substantial risk of harm to plaintiff which gives rise to punitive damages in a substantial sum to deter and punish the wrongful conduct.

**COUNT 7**
**(Negligent Misrepresentation)**
**[Craig Kapreilian and Fruit World]**

125.   Allegations 1-124 are realleged as if fully set forth herein.

126.   "One who, in the course of business, profession, or employment, or in any other transaction in which he has a pecuniary interest, *supplies false information for the guidance of others in their business transactions*, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to use reasonable care or competence in obtaining or communicating   the information." *Restatement (2d) Torts Sec. 552(1)*.

127.   The defendants cited above held themselves out as experts with cultivars and knew that planting the cultivars in Fresno County, CA created material risks that the cultivars would not be commercially viable and they knew that the research they touted had not been conducted. Additionally, they knew that projections about $.90/lb pricing and a 24.5% IRR and return of principal in 6-years were inflated or pie in the sky based on the cultivation factors and risks inherent with the unproven cultivars. Defendants also knew that Craid Kapreilian

-25-

lacked the special expertise that he ratified in the Executive Summary and Offering documents and disseminated incorrect and inaccurate information in the false advertising alleged in ¶40 **("the information").**

128.     Plaintiff, who had no expertise agriculture, reasonably and justifiably relied upon the above defendants' information and defendants intended that plaintiff rely upon it.

129.     The above defendants failed to exercise reasonable care or competence in obtaining or communicating the information to plaintiff regarding the payment, collection or distribution of certain fees and expenses.

130.     As a direct and proximate result of the false or incorrect information supplied by the above defendants, plaintiff was materially misled and sustained consequential damages such as out of pocket costs, lost profits, opportunity costs, expert costs, and fees in an amount not less than **$400,000**.

## COUNT 8
### (Tortious Interference with Contract)
### [All Defendants]

131.     Allegations 1-130 are realleged as if fully set forth herein.

132.     In 2006 plaintiff had an agreement with POGI and II which consisted of the LPA and Offering ("the agreement").

133.     Defendants acted in concert and an association in fact through ratification and knew about the agreements between plaintiff and POG I and II alleged in ¶'s 83, 84..

134.     Pursuant to ¶'s 22-61 and 99-102 defendants engaged in self-dealing, deception and material omissions which intentionally interfered with plaintiff's contractual relationship with POG I and II which impaired or caused a breach of said contract.

135.     The conduct alleged in ¶'s 22-61 and 99-102 was improper and plaintiff suffered damage caused by the impairment or breach of the POG I and II agreements in an amount to be

1  proven at trial.

2      136.    The defendants' conduct was also aggravated, outrageous, and undertaken with

3  deliberate or conscious indifference to the substantial risk of harm to plaintiff, giving rise to

4  punitive damages in an amount to punish and deter.

5

6  **COUNT 9**
**(Federal RICO: 18 USC Sec 1962 et seq)**
**[All defendants]**

7

8      137.    Allegations 1-136 are realleged, in particular **¶'s 22-61, 99-102 and Ex's 1-19**.

9      138.    Based upon the above allegations the defendants have committed at least 2

10  predicate acts: **(i)** scheme and artifice to defraud through the mails under 18 USC 1341; **(ii)** scheme

11  and artifice to defraud through use of the wires under 18 USC 1343; **(iii)** money laundering under

12  18 USC 1956; and **(iv)** aiding or assisting undocumented aliens to enter under 8 USC 1327. All

13  predicate acts were willful, coordinated, ratified, a pattern, continuing and with a threat to continue

14  and affecting interstate commerce. See **¶8** above which is incorporated herein. The culpable party

15  is the defendants herein and the racketeering enterprise is Citrine Operatios, Inc and J&R

16  Royalties, LLC ("Citrine enterprise") both Arizona organizations controlled and ratified by

17  defendants.

18      139.    In violation of 18 USC Sec 1962 *et seq.* the individual defendants conducted the

19  affairs of an association-in-fact or enterprise identified as the "Citrine enterprise" (consisting of

20  Citrines, Fruit-World Nursey, Eastside Packing, J&R Royalties and Duda Marketing) the affairs

21  of which harmed the plaintiffs through a pattern of unlawful conduct under 18 USC Sec 1962.

22  **Exhibit 14.**

23

24      140.    The Citrine enterprise and its unlawful acts of deception, diversion and

25  concealment are a continuing pattern causing ongoing damage to plaintiff.

26

27

28

141.    While the individuals are members of the Citrine Enterprise, they also have entity existence separate and distinct from the enterprise.

142.    The enterprise uses unlawful acts to harm plaintiff while concealing it.

143.    Said defendants operated and controlled the Citrine enterprise as follows:

(a)    Disseminating and Offering containing false statements of fact

(b)    Soliciting investors through deceptive advertising about cultivars

(c)    Failing to test the cultivars and having no scientifically vetted data

(d)    Engaging in unauthorized expenditures and concealing them

(e)    Returning substantial capital to insiders without disclosure to POG

(f)    Misrepresenting the status of cultivar licensing and patents

(g)    Creating an entity to divert cultivar royalty payments from POG

(h)    using undisclosed side agreements to divert royalty payments

(i)    Violating the Offering by immediately incurring bank debt

(j)    Failing to prepare for freezes and losing production through density

(k)    Misrepresenting pricing and production costs to induce investors

(l)    Concealing the incompetence of the Kapreilians farming and packing

(m)    Concealing the receipt and distribution of insurance proceeds

144.    The enterprise has an ascertainable group structure and engaged in coordinated conduct at the hub separate and apart from the lawful activity of the individuals.

145.    The enterprise has a systemic linkage because there are contractual relationships and continuing coordination of activities between said defendants. There is a common communication network allowing the individuals to share information about plaintiffs' activities which is continuing and threatens to continue and defendants have done nothing to stop the unlawful activity despite inquiries from Judson Ball.

146.    The individual defendants are willing participants in the Citrines enterprise, it has a common purpose and interest in the scheme and artifice to defraud defendants and the enterprise carries out its pattern of unlawful activity and diversion of funds with impunity.

147.   ***Four unlawful predicate acts*** exist and constitute a pattern and are continuing as alleged in **¶138.** See 18 USC Sec 1962.

148.   Each of the individual defendants conducted and participated in the affairs of the EU enterprise through a pattern of unlawful activity, including acts that are indictable under 18 USC Sec 1962.

149.   The unlawful acts have injured the plaintiffs physically and economically.

150.   Under the provisions of *A.R.S., §§ 13-2301, et seq.* of the Arizona RICO statute the individual defendants are jointly and severally liable to plaintiffs for *treble damages* under the RICO statute plus consequential and punitive damages and fees and costs.

151.   The individuals consciously perpetrated the bad acts in **¶'s 22-61 and 99-102** in a coordinated scheme to disrupt, impair and injure the plaintiff and they knew or had reason to know but consciously disregarded a substantial risk that the bad acts would injure plaintiff giving rise to **punitive damages** in an amount not less than $400,000 against the individuals jointly and severally in order to punish and deter the conduct by them and others in the future.

**COUNT 10**
**(Unjust Enrichment)**
**[All Defendants]**

152.   ¶'s 1-151 are realleged and this claim is alleged in the alternative under Arizona Civil Rule 8, and plaintiff will make an election of remedies at trial.

153.   Pursuant to ¶'s 1-151 defendants, who acted in concert and as an association in fact through ratification and acquiescence, have been enriched by the dilution of plaintiff's equity position in POG I and II without conferring the services it was supposed to perform.

154.   Plaintiff has been impoverished by the acts and omissions of defendants and defendants' enrichment and plaintiff's impoverishment are connected.

155.   There is no justification for defendants' enrichment and plaintiff's impoverishment

on this record, and if plaintiff elects to try Count 10 instead of Count 1 at trial, there is an absence of a remedy at law.

156.    Under the circumstances, defendants' retention of the converted payments and other distributions is unjustified and inequitable.  If defendants are not required to pay a refund and compensate plaintiff for consequential damages defendant will be unjustly enriched and plaintiff will continue to be unjustly impoverished.

157.    Plaintiff relied to his detriment upon the defendants acts and representations alleged herein and defendants' conduct is inequitable and caused plaintiff direct harm to be shown at trial.

### PRAYER FOR RELIEF

Plaintiff requests the entry of judgment on Counts 1-10 as follows:

A.    On Counts 1-10 for plaintiff's direct consequential damages in an amount not less than $400,000 the exact amount to be proven at trial.

B.    On Count 9 RICO for **treble** actual damages.

C.    On Counts 2-6, 8, 9 for an award of **punitive damages** against the named defendants in an amount substantial enough to punish and deter conduct intended to injure, as the defendants' conduct was aggravated, outrageous, and undertaken with deliberate or conscious indifference to the substantial risk of harm to plaintiff. Defendants knew their misconduct was directly harming plaintiff and punitive damages is warranted in an amount not less than $400,000 jointly and severally against the culpable defendants

D.    On all counts for pre/post judgment interest at the legal rate from 2008 until satisfaction of judgment.

E.    On all counts for plaintiff's attorney's fees and costs incurred under law.

F.    For such other relief the court deems equitable and appropriate.

Dated this 25th day of January, 2019.

By: /s/ Gregory G. McGill
Counsel for Plaintiff

1

VERIFICATION BY DECLARATION

2

3        Pursuant to Rule 80 and under penalty of perjury the plaintiff has reviewed the forgoing

4   Complaint and he asserts that the contents therein are true and correct.

5        Dated this 25th day of January, 2018.

6                                              PACESETTER CONSULTING, LLC

7                                              By:  /s/ Judson C. Ball, member

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28